IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Robert and Elaina Ray,　　　　　　　　　　　Case No. 2:12-cv-677

　　　　Plaintiffs,　　　　　　　　　　　　　Judge Graham

　v.

United States of America,

　　　　Defendant.

## Opinion and Order

This tax case concerns the "foster care payments" exclusion from gross income.  See 26 U.S.C. § 131.  In general, when a taxpayer receives payments from the State to provide foster care to an individual who lives in the taxpayer's home, the taxpayer may exclude those payments from gross income.  This case involves the meaning of "foster care" when the recipient of care is older than age 18.  The question presented in this case is whether the § 131 exclusion is available if the taxpayer providing care is the biological parent or guardian of a recipient who is older than age 18.

As explained below, the court finds that because the taxpayer here is the guardian of the individual receiving care – thus owing a legal duty to provide care to him – her provision of care cannot be characterized as foster care.  The relationship is not one of foster care because the recipient of care has not been removed from the care of his guardian.

**I.　　Background**

The facts of this case are not in dispute.  Taxpayers Robert and Elaina Ray reside in New Albany, Ohio with their adult son Tony, who is 30 years old.  See Aff. of Elaina Ray, ¶ 2.  Tony has been severely handicapped since birth and has been diagnosed with cerebral palsy, cortical blindness, multifocal seizure disorder, hyper triglycemia, and chronic pancreatitis, among other conditions.  Id.,¶ 3; Compl., ¶ 5.  He cannot walk, talk, or feed himself, is unable to provide for his needs and requires round-the-clock care.  Ray Aff., ¶ 4; Compl., ¶ 6.  When Tony turned 18 years old, Elaina was appointed as his legal guardian.  Ray Aff., ¶ 6.

Since turning 18 years old, Tony's care has been managed by the Franklin County Board of Developmental Disabilities.  Ray Aff., ¶ 7.  A case manager is assigned by the Board to assess Tony's

needs, and the case manager is responsible for developing an Individualized Service Plan ("ISP"). Id., ¶ 8. The ISP sets forth: the areas of care or support needed by Tony (for example, medical oversight, emergency procedures, diet/nutrition, communication, transportation, personal care, and so on); specific descriptions of how those needs are met or will be met, or how existing care can be improved; the provider who cares for the particular area of need; and the frequency or duration for which the area of need requires care. See ISP for Tony Ray (Ex. C to Pl.'s Mot. For Summ. J.).

Because Tony's needs are severe and many, much of his care must be provided by a "certified home and community based waiver or supported living provider." See ISP; Ray Aff., ¶ 12. Elaina has obtained such certification through the Ohio Department of Developmental Disabilities. See Certification Letter (Ex. E to Pl.'s Mot. For Summ. J.). Elaina thus provides for the majority of Tony's needs. The Franklin County Board of Developmental Disabilities has directed in the ISP that Tony reside in the home of Robert and Elaina Ray. Ray Aff., ¶ 14.

Elaina receives compensation from the Ohio Department of Developmental Disabilities for the care she provides Tony. Ray Aff., ¶ 11. For the 2007 tax year, for instance, Elaina received $56,642. See 2007 Form 1099-MISC (Ex. D to Pl.'s Mot. For Summ. J.). The funding for the money Elaina receives from the State of Ohio for Tony's care is provided through a Medicaid program called Individual Options Waiver ("IO Waiver"), which allows for individuals with developmental disabilities to live at home or in community-based living rather than in an institutional setting. See ISP for Tony Ray, p. 1 (listing funding source as IO Waiver); see also Ohio Admin. Code § 5101:3-41-18.

The Rays filed amended federal individual income tax returns for the tax years 2005 to 2007. The amended returns excluded from income the amounts of compensation that the State of Ohio had paid to the Rays as compensation for Elaina's care of Tony. The exclusions were claimed under 26 U.S.C. § 131 as foster care payments.

The Rays' claims for refunds for the 2005 to 2007 tax years were denied. The Rays appealed the denial of the claims to the Internal Revenue Service Office of Appeals. On January 25, 2011, their appeal as to the 2005 tax year was allowed by the IRS Appeals Office in Columbus, Ohio, resulting in a refund to the Rays of $16,208. See Compl., Ex. A. On April 19, 2012, their appeals as to the 2006 and 2007 tax years were disallowed by the IRS Appeals Office in Cleveland, Ohio. See Compl., Ex. B. The notice of disallowance explained that their claim "[d]oes not meet IRC Section 131 exclusion." Id.

The Rays filed this suit on July 26, 2012 under 26 U.S.C. § 7422 for recovery of federal income tax. The Rays allege that for the 2006 and 2007 tax years they are entitled under § 131 to exclude from income the amounts paid to them by the State of Ohio as compensation for Elaina's care of Tony. They allege that they are entitled to recover $12,808 for 2006 and $19,072 for 2007, plus interest.

The Rays and the United States have filed cross-motions for summary judgment. The parties agree that the sole issue in this case is the legal one of whether the payments the Rays received from the State of Ohio in 2006 and 2007 for Tony's care qualify for the § 131 exclusion from income. The United States, though denying that the Rays are entitled to the § 131 exclusion, has not contested the Rays' calculation of the amount of recovery if the court finds that the exclusion does apply.

## II. Motion for Summary Judgment Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379

3

(6th Cir. 1994).  Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

### III. Discussion

The Internal Revenue Code defines "gross income" as "all income from whatever source derived."  26 U.S.C. § 61(a).  Provisions in the Code granting exclusions, deductions, and exemptions are matters of legislative grace and are narrowly construed. Commissioner. v. Schleier, 515 U.S. 323, 327 (1995); Commissioner v. Sullivan, 356 U.S. 27, 28 (1958); Maniscalco v. Comm'r, 632 F.2 6, 8  Stinson Estate v. United States, 214 F.3d 846, 848 (7th Cir. 2000); Mostowy v. United States, 966 F.2d 668, 671 (Fed. Cir. 1992).  The taxpayer bears the burden of proving, by a preponderance of the evidence, that he does not owe the tax assessed by the United States. Calderone v. United States, 799 F.2d 254, 258 (6th Cir. 1986).

Section 131 of the Internal Revenue Code provides that gross income "shall not include amounts received by a foster care provider during the taxable year as qualified foster care payments." 26 U.S.C. § 131(a).

A "qualified foster care payment" is defined as:

[A]ny payment made pursuant to a foster care program of a State or political subdivision thereof--

(A) which is paid by--

    (i) a State or political subdivision thereof, or

    (ii) a qualified foster care placement agency, and

(B) which is--

> (i) paid to the foster care provider for caring for a qualified foster individual in the foster care provider's home, or
>
> (ii) a difficulty of care payment.

26 U.S.C. § 131(b)(1).

A "qualified foster individual" in turn is defined as:

> [A]ny individual who is living in a foster family home in which such individual was placed by--
>
> (A) an agency of a State or political subdivision thereof, or
>
> (B) a qualified foster care placement agency.

26 U.S.C. § 131(b)(2).

The Government does not dispute that the Rays received payments from the State of Ohio, see § 131(b)(1)(A), or that Tony was placed in the Rays' home by an agency of a political subdivision of the State of Ohio, see § 131(b)(2)(A).[1]

The focus of this dispute is on the meaning of "foster" and "foster care." Section 131 uses the word "foster" to form several terms, including: foster care provider, foster care payment, foster care placement agency, foster individual, and foster family home. Though the Code defines certain of these terms to some extent, it does not define the word "foster" itself or the term "foster care." In the absence of a statutory definition, the court must give a word or phrase its "ordinary

---

[1] Were the Rays claiming a § 131 exclusion from income for payments received under the current version of Ohio's IO Waiver program, the Government could readily argue that the payments were not made "pursuant to a foster care program" of the State. See § 131(b)(1). Under the IO Waiver program, certified or licensed care providers may be reimbursed for certain types of enumerated services, including transportation, personal care, homemaking, meals, "adult family living," and "adult foster care." O.A.C. § 5101:3-41-18(C). "Adult family living" is defined as "personal care and support services provided to an adult by a caregiver *who is related to* and lives with the individual receiving the services." O.A.C. § 5123:2-9-32(B)(2) (emphasis added). "Adult foster care" is defined as "personal care and support services provided to an adult by a caregiver *who is not related to* and lives with the individual receiving the services." O.A.C. § 5123:2-9-33(B)(2) (emphasis added).

Under the regulations in effect for the 2006 tax year, "adult foster care" was listed as a qualifying service but was not defined, and "adult family living" was not a term used at all. See O.A.C. § 5101:3-40-01(F)(18) (2006). In late 2007, a definition was added for "adult foster care" that was similar to the definition currently in effect. See O.A.C. § 5123:2-13-06(B)(2) (2007). The addition and definition of "adult family living" came in 2011. See O.A.C. § 5123:2-9-32(B)(2) (2011).

meaning." Hall v. United States, __ U.S. __, 132 S.Ct. 1882, 1887 (2012); FCC v. AT&T Inc., __ U.S. __, 131 S.Ct. 1177, 1182 (2011).

Traditionally, foster care concerns the placement of a minor into the care of someone who is not the minor's parent by blood or legal adoption. See Black's Law Dictionary (9th ed. 2009) (defining "foster care" as a social welfare program "providing substitute care for abused and neglected children who have been removed by court order from their parents' or guardians' care"). The Government argues that the word "foster" and its variations necessarily exclude the existence of a blood relationship between the caregiver and the recipient of care. Its argument is based on two dictionary definitions. The first is Merriam-Webster's definition of "foster" in its adjective sense: "affording, receiving, or sharing nourishment, upbringing, or parental care though not related by blood or legal ties." Merriam-Webster Unabridged Dictionary, available at http://unabridged.merriam-webster.com/unabridged/adjective (visited Nov. 18, 2013). The second is Black's Law Dictionary's definition of "foster" in its adjective sense:

> 1. (Of a relationship) involving parental care given by someone not related by blood or legal adoption <foster home>. 2. (Of a person) giving or receiving parental care to or from someone not related by blood or legal adoption <foster parent> <foster child>.

Black's Law Dictionary (9th ed. 2009). The Government further notes that Black's Law Dictionary defines "foster home" as a "household in which foster care is provided to a child who has been removed from his or her birth or adoptive parents, usu. for abuse or neglect." Id.

It is true that a "word's ordinary meaning is often determined by reference to dictionaries." Terrell v. United States, 564 F.3d 442, 451 (6th Cir. 2009); see also Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp., 309 F.3d 1365, 1369 (Fed. Cir. 2002) ("It is well settled that dictionaries provide evidence of a . . . term's 'ordinary meaning.'"). However, a potential limitation in the dictionary definitions cited by the Government is that they expressly make reference to parental care or to a minor child and thus seem directed to the traditional foster care setting – that of an adult providing parental care for a minor child to whom the adult is not related by blood or adoption.

These definitions do not quite fit the context of this case because the recipient of care is not a minor child. Section 131 makes clear that its provisions apply even when the foster individual has attained 19 years of age. See 26 U.S.C. § 131 (b)(4) (stating that a taxpayer may not claim exclusions for more than 5 foster individuals who have reached age 19). Section 131's legislative history

confirms this understanding.  See Micorescu v. Comm'r, T.C. Memo. 1998-398, 1998 WL 779705, at *6 (Nov. 10, 1998) ("For taxable years beginning before January 1, 1986, section 131 provided an exclusion from gross income for certain payments received by 'foster parents' for caring for foster children.  The Tax Reform Act of 1986, Pub.L. 99–514, section 1707, 100 Stat. 2085, 2781–2782, amended section 131 to extend to certain adult foster care payments the exclusion from gross income.").

Section 131's expansion of the concept of foster care to include recipients age 19 or older is thus what potentially limits the usefulness of dictionary definitions in deciding the issue in this case.  The Government's attempt to bolster its argument – that the existence of a blood relationship between Elaina and Tony is what eliminates it from being a foster care relationship – by citing other statutory or regulatory provisions regarding foster children suffers from the same potential limitation, namely that these other definitions relate to minor children, whereas § 131 is not so restricted.  See 45 C.F.R. § 1355.20 (defining "foster care" – in regulations regarding child and family services – as "24-hour substitute care for children placed away from their parents or guardians"); O.R.C. § 5103.02(D) (defining "foster home" as "a private residence in which children are received apart from their parents, guardian, or legal custodian by an individual reimbursed for providing the children nonsecure care, supervision, or training twenty-four hours a day").

There are no regulations under § 131, and the parties have cited no case law in support of their positions.  The court's own research finds that § 131 has been litigated in only a handful of cases, none of which dealt with the issue raised here.  See In re Booker, 301 B.R. 207, 210 (N.D. Ohio Bankr. 2003) (holding that under a prior version of § 131, payments received by taxpayer from a for-profit, foster child placement agency were not "qualified foster payments"); Stromme v. Comm'r, 138 T.C. 213, 218-19 (2012) (holding that a house where taxpayers provided care to developmentally-disabled adults was not the foster care provider's "home" because the taxpayers resided in a different house); Dobra v. Comm'r, 111 T.C. 339, 348 (1998) (holding that "a foster care provider must reside in a house or other residential structure, before that structure can qualify as 'the foster care provider's home' for purposes of section 131"); Cato v. Comm'r, 99 T.C. 633, 646 (1992) (holding that payments was made by the State even if the original source of the funds was the federal government).

Aside from citing dictionary definitions of "foster," the Government has furnished no reasoning or policy grounds for its position that the Rays are not entitled to claim the § 131

exclusion. Even so, it remains the taxpayers' burden, both of proof and persuasion, to establish that they are entitled to the exclusion from income. See Calderone, 799 F.2d at 258.

For their part the Rays argue that the key element in the concept of "foster care" is the assumption of a duty to provide care to an individual in need, where such a duty is not otherwise imposed by law. Their argument has potential merit. See, e.g., Nichol v. Stass, 192 Ill.2d 233, 250, 735 N.E.2d 582, 592 (Ill. 2000) ("[F]oster parents voluntarily assume a contractual duty to provide care and supervision for foster children . . . ."). With a minor child, the existence of a blood parent-child relationship or the completion of the adoption process creates a legal duty of care to the child. Under Ohio law, for instance, biological parents are the "natural guardians of their minor children" and are "charged with their care, nurture, welfare, and education and the care and management of their estates." O.R.C. § 2111.08. A final decree of adoption in Ohio creates "the relationship of parent and child between petitioner and the adopted person, as if the adopted person were a legitimate blood descendant of the petitioner." O.R.C. § 3107.15(A)(2). In the traditional setting of foster care provided to a minor child, the caregiver becomes a foster parent when she assumes a duty to provide parental care to the minor, where no duty otherwise existed because the minor is not her child by blood or adoption. In other words, a parent by blood or adoption cannot be a foster parent to her minor child because a legal duty to provide care is already imposed by law.

The legal duty of parental care that is imposed upon blood and adoptive parents ceases when the child reaches the age of majority. See Blevins v. Hartman, Nos. 12CA116, 12CA115, 2013 WL 3936039, at *6 (Ohio Ct. App. July 18, 2013) ("A child remains under the care and control of its parents until the age of majority, defined in Ohio, as the age of eighteen years.") (internal quotation marks omitted). The Rays thus argue that they had no duty to care for Tony once he turned age 18 and that their voluntary assumption of care for him as an adult satisfies the definition of foster care.

One issue not carefully addressed by either party is whether Tony actually is an adult. The Rays refer to him as such, stating that once Tony turned 18 years old, "he became an adult not legally owed a duty by Elaina." Pls.' Mot. for Summ. J., p. 18; see also Ray Aff., ¶ 5 ("My son is now an adult."). They do not explain why he is an adult but seem to use the word "adult" in the ordinary sense of him having reached 18 years of age. The Government similarly describes Tony as an "adult son." Def.'s Mot. for Summ. J., p. 9.

Whether Tony meets the legal definition of an adult – one who has reached the age of majority – is a separate matter. See Black's Law Dictionary (9th ed. 2009) (defining "adult" as a "person who has attained the legal age of majority"). Even though the Internal Revenue Code

8

contains many definitions, "adult" or "age of majority" do not appear to be among them. Section 131 itself makes reference to individuals who have attained age 19 (in stating that a taxpayer may not claim an exclusion for more than 5 individuals over age 19), but it does not use the terms "adult" or "age of majority." See 26 U.S.C. § 131(b)(4).[2]

Under Ohio law, the statutory section entitled "Age of majority" provides: "All persons of the age of eighteen years or more, who are under no legal disability, are capable of contracting and are of full age for all purposes." O.R.C. § 3109.01. A "legal disability" is defined as:

(A) Persons under the age of eighteen years;

(B) Persons of unsound mind;

(C) Persons in captivity;

(D) Persons under guardianship of the person and estate, or either.

O.R.C. § 2131.02. The Rays have submitted proof that Tony has been under the guardianship of his mother since he turned age 18. See Ray Aff., ¶ 6; Letter of Guardianship issued by the Probate Court of Franklin County, Ohio (attached to Ray Aff.). The Letter of Guardianship states that Tony is an incompetent, as opposed to a minor. See O.R.C. § 2111.01(D) (defining an "incompetent" as "any person who is so mentally impaired as a result of a mental or physical illness or disability . . . that the person is incapable of taking proper care of the person's self or property").

---

[2] The Code elsewhere defines a "qualifying child" in its provision regarding dependents. A qualifying child, among other things, is an individual who: (1) has not attained the age of 19, (2) is a student who has not attained the age of 24, or (3) is permanently and totally disabled, regardless of age. See 26 U.S.C. § 152 (c)(3). Without deciding as a matter of law that Tony is an individual with a permanent and total disability, it appears to the court that he is, based upon the evidence submitted about his medical conditions and physical limitations. See 26 U.S.C. § 22(e)(3) ("An individual is permanently and totally disabled if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."). Thus, it can be said on the record before the court that Tony potentially is a qualifying child under the Code, despite having attained age 19. See Bobo v. Comm'r, T.C. Memo. 2010-121, 2010 WL 2195278, at *3 (2010) (holding that a 54-year-old individual with a permanent and total disability was a qualifying child); see also 26 U.S.C. § 152(c)(1) (setting forth other requirements for the definition of a "qualifying child").

It would not be accurate to describe Tony as an adult under Ohio law. He is an incompetent and a ward[3] who, because of his legal disability, has not reached the age of majority under Ohio law. He lives with and receives care from his biological mother, who is also his guardian.

That Tony is under his mother's guardianship undercuts the Rays' argument for why their relationship with Tony can be described as a foster care relationship. They contend that Tony is an adult for whom they have no legal duty to provide care and that their voluntary provision of care can only be described as "fostering." See Pls.' Response Br., p. 3. But a guardian has a legal duty under Ohio law to "protect and control the person of the ward" and to "provide suitable maintenance for the ward." O.R.C. § 2111.13(A)(1),(2). It may be true that Elaina, as Tony's guardian, is not required to personally provide care to Tony, but she is legally obligated to arrange for or make sure that care is provided to him. Id. See also Witt v. Ward, 60 Ohio App.3d 21, 23, 573 N.E.2d 201, 205 (Ohio Ct. App. 1989) ("The duty of a guardian is to manage and preserve the ward's estate, to provide for the care and protection of the ward's person and to act in the best interest of the ward."); Black's Law Dictionary (9th ed. 2009) (defining a "guardian" as one "who has the legal authority and duty to care for another's person or property"). Thus, the Rays' argument that "Elaina is providing care to an individual where she owes no obligation" is not correct. Pls.' Response Br., p. 4.

One could argue that the existence of the guardianship should not disqualify the relationship between Elaina and Tony from being a foster care relationship. The Rays could have let Tony become a ward of the state when he turned age 18. Instead, Elaina voluntarily assumed the duties of guardianship, and one could argue that it is the voluntary nature of the caregiver's actions that characterizes a foster care relationship.[4] However, voluntariness cannot be what sets apart a foster care relationship. In many cases, biological parents voluntarily decide to try and have a child. Adoptive parents voluntarily make the decision to adopt a child. By definition, biological and adoptive parents are not foster parents to their minor children, regardless of the voluntary nature of their decisions to have or adopt children.

---

[3] Ohio law defines a "ward" as "any person for whom a guardian is acting or for whom the probate court is acting." O.R.C. § 2111.01(B). See also Black's Law Dictionary (9th ed. 2009) (defining a "ward" as a "person, usu. a minor, who is under a guardian's charge or protection").

[4] The Rays do not make this exact argument, but they do repeatedly emphasize that Elaina voluntarily took on a duty when she had no legal obligation to do so.

10

The court concludes, for purposes of resolving this case, that what characterizes a foster care relationship is the provision of care in one's home to an individual in the absence of an existing legal duty to provide care to that individual. In large measure, the court agrees with the Rays' definition of foster care but believes that the guardianship counts as an existing legal duty. When Elaina became Tony's guardian, Ohio law imposed a duty on her to protect and provide for him. That the Rays further decided to care for Tony in their home is commendable but does not transform the relationship into one of foster care.

The court's interpretation of "foster care" under § 131 is consistent with the dictionary definitions cited at the start of this discussion. Black's Law Dictionary defines "foster care" as a social welfare program "providing substitute care for abused and neglected children who have been removed by court order from their parents' or *guardians'* care." Black's Law Dictionary (9th ed. 2009) (emphasis added); see also 45 C.F.R. § 1355.20 (defining "foster care" as "24-hour substitute care for children placed away from their parents or *guardians*") (emphasis added). Tony has not been removed from his guardian's care.[5] And Merriam-Webster defines the adjective sense of "foster" as "affording, receiving, or sharing nourishment, upbringing, or parental care though not related by blood or *legal* ties." Merriam-Webster Unabridged Dictionary, available at http://unabridged.merriam-webster.com/unabridged/adjective (visited Nov. 18, 2013) (emphasis added). Tony is receiving care from someone with whom he has legal ties.

Finally, the court's interpretation of § 131 is consistent with the requirement that exclusions from income in the Internal Revenue Code be narrowly construed. See Commissioner. v. Schleier, 515 U.S. 323, 327 (1995). Though the 1986 amendment to § 131 extended the exclusion to taxpayers caring for individuals who have attained age 19, the statutory provision retained the terms "foster" and "foster care." Those terms must have meaning as applied to situations in which the recipient of care is age 19 or older. The court concludes that "foster" and "foster care" require the absence of an existing legal duty to care for the individual receiving care in the taxpayer's home. Because Ohio law imposes a duty on Elaina, as Tony's guardian, to protect his person and provide maintenance for him, see O.R..C. § 2111.13(A), the relationship between Elaina and Tony is not a foster care relationship within the meaning of § 131 of the Internal Revenue Code. The Rays have not carried their burden of proving by a preponderance that the payments they received from the

---

[5] "Long-term foster care" is similarly defined as the "placing of a child in foster care for extended periods . . . in lieu of family reunification, termination and adoption, or *guardianship*." Black's Law Dictionary (9th ed. 2009) (emphasis added).

State of Ohio in 2006 and 2007 are excludable from gross income under § 131. Thus, they owe the tax assessed by the United States.

### IV.     Conclusion

Accordingly, the Rays' motion for summary judgment is DENIED (doc. 18), and the Government's motion for summary judgment (doc. 19) is GRANTED.

s/ James L. Graham<br>
JAMES L. GRAHAM<br>
United States District Judge

DATE: January 6, 2014